MARILYN HAUDRICH, as Ex'r and Sole Legatee of Donald Haudrich, Deceased, Plaintiff-Appellee, v. HOWMEDICA, INC., *et al.*, Defendants-Appellants.

Fifth District   No. 5—92—0863

Opinion filed November 14, 1994.

James V. O'Brien and Thomas L. Caradonna, both of Lewis, Rice & Fingersh, of St. Louis, Missouri, for appellants.

Thomas Q. Keefe, Jr., of Thomas Q. Keefe, Jr., P.C., and Harriet H. Hamilton, of Cook, Shevlin, Ysursa, Brauer & Bartholomew, Ltd., both of Belleville, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

In November 1985 Dr. Simmons inserted a Howmedica knee implant into Donald Haudrich and told him it should be good for approximately 10 years. Three years later the implant failed, and Dr. Simmons successfully inserted another, different type of Howmedica knee, but Donald could not return to work. Donald sued Howmedica, the manufacturer, on a product liability theory, and after a bench trial, Donald was awarded $1,686,988.70. (Donald died during this appeal, and Marilyn Haudrich has been substituted as plaintiff. Both will be referred to as plaintiff.)

The only issue we will address in this opinion is whether this product liability claim is preempted by the 1976 Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act (21 U.S.C.A. § 360 *et seq.* (West Supp. 1994)). We conclude that there is no preemption of this claim. Neither the statute involved nor its legislative history nor the regulations promulgated under the authority of the statute support a claim of preemption under the United States Supreme Court's consensus of rules for analyzing such claims. (*Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 120 L. Ed. 2d 407, 112 S. Ct. 2608.) The preemption doctrine in tort cases has been raised only relatively recently. (Foote, *Administrative Preemption: An Experiment in Regulatory Federalism*, 70 Va. L. Rev. 1429, 1430 (1984) (*Administrative Preemption*).) Commentators have offered different reasons for its late arrival on the legal scene. Some have suggested that respect for federalism has protected the States' court systems from intrusion in an area that has been recognized as a matter for local rather than Federal law since the inception of the nation. (Winokur & Robbins, *Consumer Product Safety: Preemption, The Commerce Clause & State Regulatory Authority*, 25 Vill. L. Rev. 232 (1979-80).) Others have suggested that parties' concerns about federalism are pendulum-like and swing from a desire for no intrusion to a prayer for full preemption depending upon which side feels preemption will be beneficial to its position. (*Administrative Preemption*, 70 Va. L. Rev. at 1466.) Regardless of the reasons for the doctrine's prepubescent involvement in the tort field, it has existed long enough for litigation with claims of preemption to reach the United States Supreme Court.

In *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 120 L. Ed. 2d 407, 112 S. Ct. 2608, the Supreme Court addressed the defendant's claim of preemption, which was based on the Federal Cigarette Labeling and Advertising Act of 1965 (Act) (15 U.S.C.A. §§ 1331 through 1340 (West 1982)) and its 1969 amendments. Although Justice Stevens wrote for the plurality, a rearrangement of the three opinions serves to highlight the agreement on certain rules that are shared by all the justices.

Justices Kennedy, Souter, and Blackmun concurred in part because they agreed that the 1965 Act did not preempt tort claims against cigarette manufacturers, and they dissented in part because they concluded that its 1969 amendments also did not preempt.

Justices Scalia and Thomas also concurred in part and dissented in part. They dissented because they thought that both the 1965 Act and its 1969 amendments preempted all such tort claims, but they agreed with Justice Stevens' relation of most of the rules for the determination of preemption claims. The Scalia-Thomas dissent disagreed with the other seven justices on only one of its stated rules:

> "[T]he pre-emptive scope of the 1965 Act and the 1969 Act is *governed entirely by the express language* in § 5 of each Act." (Emphasis added.) (*Cipollone*, 505 U.S. at 517, 120 L. Ed. 2d at 423, 112 S. Ct. at 2618.)

Therefore, on the express-language point, seven of the nine members of the Supreme Court are in agreement, and on the other rules for determining preemption, all nine are in agreement.

What then are the rules governing the resolution of preemption claims that are agreed upon by all nine members of the Court?

> (1) "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded *** unless that [is] the clear and manifest purpose of *Congress.*' " (Emphasis added.) *Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617, quoting *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 91 L. Ed. 1447, 1459, 67 S. Ct. 1146, 1152.

> (2) Perhaps a corollary to number one, but separately stated, " ' "[T]he purpose of *Congress* is the ultimate touchstone" ' of preemption analysis. [Citation.]" (Emphasis added.) 505 U.S. at 516, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617.

> (3) There is a "presumption against the pre-emption of state police power regulations." 505 U.S. at 518, 120 L. Ed. 2d at 424, 112 S. Ct. at 2618.

> (4) Perhaps as a corollary to number three's presumption, but separately stated, "This presumption reinforces the appropriateness of a narrow reading ***." 505 U.S. at 518, 120 L. Ed. 2d at 424, 112 S. Ct. at 2618.

(5) The fact "[t]hat Congress requires a particular warning label does not automatically pre-empt a regulatory field." 505 U.S. at 518, 120 L. Ed. 2d at 424, 112 S. Ct. at 2618.

(6) "[T]here is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions." 505 U.S. at 518, 120 L. Ed. 2d at 424, 112 S. Ct. at 2618.

(7) Common law damage actions can impose requirements. *Cipollone*, 505 U.S. at 521, 120 L. Ed. 2d at 425-26, 112 S. Ct. at 2620.

The Blackmun-Kennedy-Souter concurrence supplies an addendum to number seven, and as this addendum is neither rejected nor criticized by any of the other opinions, it is also presumably agreed upon by all nine members of the Court.

"The principles of federalism and respect for state sovereignty that underlie the Court's reluctance to find pre-emption where Congress has not spoken directly to the issue apply with equal force where Congress has spoken, though ambiguously. In such cases, the question is not *whether* Congress intended to pre-empt state regulation, but to what *extent*. We do not, absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language. I therefore agree with the Court's unwillingness to conclude that the state common-law damages claims at issue in this case are pre-empted unless such result is ' "the clear and manifest purpose of Congress." ' [Citation.]" (Emphasis in original.) *Cipollone*, 505 U.S. at 533, 120 L. Ed. 2d at 433, 112 S. Ct. at 2626 (Blackmun, J., concurring in part and dissenting in part, joined by Kennedy and Souter, JJ.).

This compilation of the rules relied upon by the Supreme Court in one of its more recent rulings on the preemption issue makes two things clear. One, case law can constitute a requirement which can be barred by the preemption doctrine. Two, in order for case law to constitute such a requirement and to invoke preemption, it must be abundantly clear that Congress intended that result.

In addition to the general principles laid down in *Cipollone*, we think it is significant that the Justice Stevens opinion largely based its conclusions of no preemption for the 1965 Act and preemption for the 1969 amendment on the differences in wording. The 1965 Act provided in part:

"(a) *No statement* relating to smoking and health, other than the statement required by section 4 of this Act, *shall be required* on any cigarette package.

(b) *No statement* relating to smoking and health *shall be required* in the advertising \*\*\*." (Emphasis added.) (Federal Cigarette

Labeling and Advertising Act, Pub. Law 89—92, 79 Stat. 282, as amended, 15 U.S.C.A. §§ 1331 through 1340 (West 1982).)

Justice Stevens concluded that "[section] 5 of the 1965 Act only pre-empted state and federal rulemaking bodies from mandating particular cautionary statements and did not pre-empt state-law damages actions." (*Cipollone*, 505 U.S. at 519-20, 120 L. Ed. 2d at 425, 112 S. Ct. at 2619.) Justice Stevens then compared the 1965 Act with the 1969 amendment, which provided:

> "*No requirement or prohibition* based on smoking and health *shall be imposed under State law* with respect to the advertising \*\*\*." (Emphasis added.) (Public Health Cigarette Smoking Act of 1969, Pub. Law 91—222, 84 Stat. 87, as amended, 15 U.S.C.A. §§ 1331 through 1340 (West 1982).)

Justice Stevens concluded that the emphasized language, among other things, warranted extending preemption to State damage actions. This comparison and conclusion is significant because, even though the Medical Device Amendments preemption provision does not mirror either the 1965 Act or the 1969 amendment, it is certainly closer in tenor to the 1965 Act.

With these principles in mind, we turn first to an examination of the statute involved in this case.

## STATUTE

Section 360k of the Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act provides:

> "§ 360k State and local requirements respecting devices
> (a) General rule
> Except as provided in subsection (b) of this section, *no State or political subdivision* \*\*\* may *establish or continue in effect* with respect to a device intended for human use *any requirement*—
> > (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> > (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.
> (b) Exempt requirements
> Upon application of a State or a political subdivision thereof, the Secretary may \*\*\* exempt from subsection (a) \*\*\* a *requirement* of such State or political subdivision \*\*\* if
> > (1) the requirement is more stringent \*\*\*; or
> > (2) the requirement—
> > > (A) is required by compelling local conditions, *and*
> > > (B) compliance with the requirement would not cause the device to be in violation of any applicable require-

ment under this chapter." (Bold deleted; emphasis added.) 21 U.S.C.A. § 360k (West Supp. 1994).

■ The first point to be made based on the statute's language requires a comparison of the opening sentences of the opening paragraphs of section (a), the general rule, and section (b), the exemption section.

Section (a) provides:

> "*[N]o State or political subdivision of a State* may establish *** any requirement ***."

Section (b) provides:

> "*Upon application of a State or a political subdivision* thereof, the Secretary may *** exempt *** a requirement ***." (Emphasis added.) 21 U.S.C.A. § 360k (West Supp. 1994).

The same emphasized phrase is used in each section, but the action contemplated by that phrase effectively excludes courts. Why? Because, although it has been held that courts are capable of establishing requirements by imposing damage awards (*San Diego Building Trades Council, Millmen's Union, Local 2020, Building Material & Dump Drivers, Local 36 v. Garmon* (1959), 359 U.S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773), a capability that could qualify courts as actors under section (a), it has never been held that courts can *apply for exemption* to the Secretary of Health, Education, and Welfare or to any other person or entity. Because courts are neither legally nor practically capable of applying for exemptions and, therefore, cannot come within the definition of "State or political subdivision" of section (b), it would certainly be anomalous to include them in the identical definition under section (a). If courts cannot be incorporated into the phrase "State or political subdivision," then they cannot be the source of "requirements" that are preempted.

Further, the use of the phrase "State *or* political subdivision" suggests positive requirements (*i.e.*, statutes, ordinances, or regulations), and not case law, because political subdivisions such as counties and cities do not have the power to hand down case law. Although it could be argued that "State" could include the courts of the State, if such a broad construction is to be given that word, then it is obvious that "State" could also include political subdivisions of the State. Since words in a statute must be construed to have some meaning and purpose, *i.e.*, to be nonsuperfluous (*Platt v. Union Pacific R.R. Co.* (1879), 99 U.S. 48, 25 L. Ed. 424; *Hirschfield v. Barrett* (1968), 40 Ill. 2d 224, 239 N.E.2d 831), the words "political subdivision" must mean something, and obviously they mean what the words ordinarily mean. (See also the discussion under REGULATIONS, *infra*.) Their inclusion strongly suggests that Congress' use of the term "require-

ment" meant a requirement imposed by statutory authority and not by case law.

The second emphasized phrase, "establish or continue in effect *** a requirement," also suggests that Congress intended "requirement" to refer to statutes, ordinances, or regulations, all of which can be established or continued in effect. Case law is handed down, developed, or decreed, but it is not "established or continued in effect."

Not only does the language in the emphasized portions of subsection (a), the general rule, support the idea that Congress did not intend to preempt common law decisions, but the emphasized wording of subsection (b), exempt requirements, supports the same conclusion. An unstrained reading of "the Secretary may exempt *** a *requirement* of such State or political subdivision" leads to the conclusion that statutes, ordinances, or regulations are what "requirement" is describing; Secretaries do not normally exempt court decisions.

A call for an unstrained wording of the statute is not the only basis for concluding that "requirement" does not include case law. Recall that in this context the statute is speaking of exempting requirements of State and political subdivisions. When we turn from the words of the statute to the actions of the Commissioner of the Food and Drug Administration (FDA) (who is authorized to grant these exemptions (21 C.F.R. § 808.1 (1994))), we discover that 21 States and the District of Columbia have sought exemptions from section 360k's preemption doctrine. More importantly, although the Commissioner granted exemptions in each of the 22 instances that exemptions were sought, there have been *no* exemptions sought or granted that deal with court decisions. This null set of exemptions for court decisions strongly suggests that the unstrained interpretation of "requirement" is the appropriate one.

The final point to be made based on the wording of section 360k itself is the repeated use of the word "requirement" to designate both the actions taken, or to be taken, by Congress and/or the FDA and any future actions to be taken by States or political subdivisions. In both section 360k(a), the general-rule-of-preemption provision, and section 360k(b), the exemption-from-preemption section, Congress used the language "*requirement* applicable under this chapter" when referring to action to be taken by it and the FDA. Any action taken by Congress or the FDA would of necessity be in the form of statutes or regulations. To state the obvious, Congress legislates; the FDA regulates; but neither Congress nor the FDA can adjudicate. Therefore, Congress' use of the term "requirements" not only to de-

scribe actions taken by it and/or the FDA but also to describe actions taken by "State or political subdivisions" leads to the conclusion that a "requirement" in the latter context will be imposed by either a legislative or regulatory agency, and the corollary of that conclusion is that "requirement" in this context does not mean something imposed by a court.

## LEGISLATIVE HISTORY

■ Turning from the wording of the statute to its legislative history, we find three indications that Congress did not intend to preempt tort litigation in this country when it passed the 1976 Medical Device Amendments. First, the primary purpose of the 1976 Medical Device Amendments was "to assure the reasonable safety and effectiveness of medical devices intended for human use." (D. O'Keefe & R. Spiegel, An Analytical Legislative History of the Medical Device Amendments of 1976, appendix II, at 51 (1976) (An Analytical Legislative History).) If safety promotion was Congress' primary purpose, it would be strange for Congress to eliminate the safety aspects inherent in tort litigation (W. Prosser, Torts § 5, at 23 (4th ed. 1971); Prentice & Roszkowski, *"Tort Reform" and the Liability "Revolution": Defending Strict Liability in Tort for Defective Products*, 27 Gonz. L. Rev. 251 (1991-92)) by destroying tort litigation in the entire country with the same statute it passed to promote safety. It would be stranger still for Congress to take such a dramatic action without even mentioning it as a consequence of the passage of a bill that was debated for years. Yet the debate and Congressional record are barren of any indication that Congress intended to preempt court decisions by passing the 1976 Medical Device Amendments.

The second indication of a lack of intent to preempt is found in the Committee Report:

"The Committee recognizes that if a substantial number of differing requirements applicable to a medical device are imposed by *jurisdictions other than the Federal government*, interstate commerce would be unduly burdened. For this reason the reported bill contains special provisions (new section 521 of the Act) governing regulation of devices by States and *localities*." (Emphasis added.) (An Analytical Legislative History, appendix III, at 45.)

The emphasis on *jurisdiction* and *localities* is to highlight that the Committee's concern was over requirements imposed by the types of entities discussed earlier, States, counties, and municipalities, and not by courts.

The third basis of the conclusion is afforded by the only example given in the legislative history of a requirement "imposed by jurisdictions other than the Federal government," California's 1970 Sherman Food, Drug, and Cosmetic Law. In fact, the Committee used the California *statute* as an example of a "requirement":

> "In the Committee's view, requirements imposed under the California *statute* serve as an example of *requirements* that the Secretary should authorize *to be continued* \*\*\*." (Emphasis added.) An Analytical Legislative History, appendix III, at 46.

The fact that the only example given in the legislative history is that of a California statute strengthens by implication the first basis. If Congress thought a California statute worthy of comment as an example of a requirement, how much more significant is it that Congress did not indicate that it considered court decisions to be within the realm of requirements?

## REGULATIONS

■ Turning from the language of the statute and its legislative history to the language of the regulations promulgated to explain and implement the statute, we first examine some basic definitions. "Political subdivision" is defined as "any lawfully established local governmental unit" that has "the authority to establish or continue in effect any requirement." (21 C.F.R. § 808.3(d) (1994).) Although "local governmental unit" is not defined by the regulations, Black's Law Dictionary supplies a definition of "local government": "City, county, or other governing body at a level smaller than a state. Local government has the greatest control over real property, zoning, and other local matters." (Black's Law Dictionary 939 (6th ed. 1990).) These definitions make it clear that Congress and the Commissioner were not contemplating courts as the source of requirements under section 360k. This interpretation is strengthened by an examination of the definition of "compelling local conditions," which "includes any factors, considerations, or circumstances prevailing in, or characteristic of, the geographic area or population of the State or political subdivision." (21 C.F.R. § 808.3(b) (1994).) Courts exist to resolve disputes, and the resolutions of these disputes do not depend upon "factors, considerations, or circumstances prevailing in, or characteristic of, the geographic area or population." Therefore, the definitions of both "political subdivision" and "compelling local conditions" support the idea that courts were not intended to be within the class of entities that establish requirements. Obviously, if courts are not within the class of entities that establish requirements, court decisions are not within the class of entities whose decisions are preempted by section 360k.

The next portion of the regulations that militates against the inclusion of courts within the class of those which create requirements is section 808.5, "Advisory Opinions." Subsection (a) provides:

> "(a) Any State, political subdivision, or other interested person *may request an advisory opinion* from the Commissioner with respect to [preemption matters]." (Emphasis added.) (21 C.F.R. § 808.5(a) (1994).)

Although it might be quite helpful to a State, county, or city to have the Commissioner's input on whether its requirement would be preempted, and therefore it might be appropriate for any or all of those entities to seek an advisory opinion from the Commissioner, it would be absolutely inappropriate for a court to make such a request. This implicit exclusion of courts from the contemplated actions of States and political subdivisions also eliminates courts as a source of requirements and excludes their decisions from preemption.

This exclusionary rationale finds further support in section (b):

> "*The Commissioner may issue* an advisory opinion relating to a State or local requirement *on his own initiative* when he makes one of the following determinations ***.
>
> (2) A *proposed* state or local requirement *** is not eligible for exemption from preemption ***." (Emphasis added.) (21 C.F.R. § 808.5(b) (1994).)

Two aspects of this quotation strengthen the conclusion that courts were not included within the class of those whose acts would be preempted. First, a Commissioner's advisory opinion to a court on an issue that is before the court would be an improper communication and is, therefore, not likely to be what the Commissioner had in mind when the regulation was promulgated. Second, section (b)(2) refers to "*proposed* *** requirement," and courts do not issue "proposed" requirements; they render final decisions.

When we move from the regulations' definition and advisory-opinion provisions to their explanation of the exemption procedures, we discover some extremely telling terms. Section 808.20(a) provides:

> "(a) *Any State or political subdivision* may apply to the Food and Drug Administration *for an exemption from preemption for any requirement that it has enacted* and that is preempted. An exemption may only be granted for a requirement that has been *enacted, promulgated,* or *issued* in final form by the authorized body or official of the State or political subdivision so as to have the force and effect of law. However, *an application for exemption may* be *submitted before the effective date* of the requirement." (Emphasis added.) (21 C.F.R. § 808.20(a) (1994).)

The use of the word "enacted" can only refer to requirements passed by legislative bodies, not to decisions issued by courts. If it were to be

contended that courts do "issue" opinions, there are three indications within this section that weigh against such a contention. First, "issued" can also refer to regulations and ordinances. Second, the word "issued" is third in the series of "enacted, promulgated or issued," and the first two clearly refer to legislative and/or regulatory methods. When two or more words of analogous meaning are employed together in a statute, they are understood to express the same relation (*People v. Goldman* (1972), 7 Ill. App. 3d 253, 255, 287 N.E.2d 177, 179); therefore, the word "issued" should be considered as of the same type as "enacted and promulgated" and, therefore, legislative or regulatory. Third, there is a reference to "the *effective* date of the requirement." Generally, only legislative and regulatory pronouncements have any concern about effective dates.

Moving from subsection (a) to subsection (c) of section 808.20, we find the Commissioner calling for certain materials to accompany an application for an exemption, among which are:

> "(1) Identification and a current copy of any *statute, rule, regulation, or ordinance* of the State or political subdivision *considered* by the State or political subdivision *to be a requirement which is preempted*, with a reference to the date of *enactment, promulgation, or issuance* in final form [and] [i]f the *requirement* has been subject to any *judicial* or *administrative* interpretations, the State or political subdivision shall furnish copies of such judicial or administrative interpretations." (Emphasis added.) (21 C.F.R. § 808.20(c)(1) (1994).)

Perhaps the clearest indication of all is the first phrase of section (c)(1), "a current copy of any *statute, rule, regulation or ordinance* \*\*\* considered \*\*\* to be a *requirement*." (Emphasis added.) (21 C.F.R. § 808.20(c)(1) (1994).) Every item in the series is legislative or regulatory; there is absolutely no reference to, or indication of, any intent to include court decisions as a source of requirements. If any buttressing of this position is needed, it is found in the last sentence of section (c)(1), which refers to *judicial interpretations* of the *requirements*.

Finally, subsection (c)(5) requires identification of:

> "(5) The title of the chief administrative or legal officers of that State or local agency that has primary *responsibility for administration of the requirement*." (Emphasis added.) (21 C.F.R. § 808.20(c)(5) (1994).)

State and local agencies administer requirements; courts do not.

The final section of the regulations that we shall examine is the only one that offers support for defendants' position, but before quoting that portion of the regulation (21 C.F.R. § 808.1(b) (1994)), we will first examine another, and contradictory, portion of the same regulation (21 C.F.R. § 808.1(d)(6)(ii)), which provides in part:

"In determining whether such a requirement is preempted, the determinative factor is how the *requirement* is interpreted and enforced by the State or local government and not the literal language of the *statute* \*\*\*." (Emphasis added.) (21 C.F.R. § 808.1(d)(6)(ii) (1994).)

Again, the Commissioner has equated the term "requirement" with a statute, not with a court decision.

The Secretary departs from this continuous and consistent treatment of requirement as synonymous with either legislative or regulatory pronouncements, and not with judicial acts, on only one occasion, the portion of section 808.1(b) mentioned earlier, which provides:

"[N]o State or political subdivision of a State may establish or continue in effect any requirement \*\*\* (whether established by statute, ordinance, regulation, *or court decision*) \*\*\*." (Emphasis added.) (21 C.F.R. § 808.1(b) (1994).)

The emphasized phrase, "or court decision," clearly supports defendants' position that the Commissioner intended to preempt judicial decisions under the 1976 Medical Device Amendments, and it is the wording that has been relied upon by at least one court. (See *Mendes v. Medtronic, Inc.* (1st Cir. 1994), 18 F.3d 13; *King v. Collagen Corp.* (1st Cir. 1993), 983 F.2d 1130; *Stamps v. Collagen Corp.* (5th Cir. 1993), 984 F.2d 1416; *Covey v. Surgidev Corp.* (N.D. Ohio 1993), 815 F. Supp. 1089. But see *Kociemba v. G.D. Searle & Co.* (D. Minn. 1988), 680 F. Supp. 1293; *Larsen v. Pacesetter Systems, Inc.* (1992), 74 Haw. 1, 837 P.2d 1273, *modified on motion for reconsideration* (1992), 74 Haw. 650, 843 P.2d 144.) The problem with the parenthetical language is that it is contrary to every other expression by the FDA on this point, including the administration's statements published at the time of the adoption of the regulation in which it repeatedly refers to "State and local *governments*," "State or local *legislative body*," "State *statutes*," "State *provision*," and a "State or *local provision*" (emphasis added) (43 Fed. Reg. 18661, 18662—64 (1978)) and, equally important, in which it *nowhere* refers to court decisions as being within the preempted area. We cannot conclude, under these circumstances, that preemption of common law actions is mandated.

We have spent some time in setting forth the multiple statements that belie the Commissioner's solitary inclusion of judicial decisions, because of the importance of the issue of federalism. The weakness of the central government under the Articles of Confederation precipitated the calling of the constitutional convention, but the framers' experiences in the then-recent revolution had created memories that cautioned the States against relinquishing too much control. As

always when two competing principles are compressed into a compromise, stress survived.

This stress was the subject of judicial action during the country's early years (*Gibbons v. Ogden* (1824), 22 U.S. (9 Wheat) 1, 6 L. Ed. 23), and on one occasion became so great that the ever-present potential conflict between the central government and the States erupted into war. Although the Civil War resolved the most catalytic of the circumstances underlying Federal-State tensions, cases that called for resolution of these tensions continued to arise. (*Gulf, Colorado & Santa Fe Ry. Co. v. Hefley & Lewis* (1895), 158 U.S. 98, 39 L. Ed. 910, 15 S. Ct. 802.) In most of these cases, the Court, though not reluctant to enforce the provisions of the supremacy clause, has been conscious of the deference due the States, particularly in areas traditionally reserved to State resolution. It is this deference, coupled with the language of section 360k, its legislative history, and the Commissioner's almost unanimous exclusion of court decisions from the preemption area, that causes us to reject its single inclusion in the area.

With regard to defendants' claim that FDA involvement in the medical-device field insures adequate protection in this area, we note than on November 28, 1990, the Commissioner admitted:

"[None of the] reviews of pre-1976 devices even began until very recently.

\* \* \*

98 percent of the estimated 5,000 devices that enter the market every year do so on the basis of a claim by their manufacturer that they are substantially equivalent to an earlier device. In particular, over 80 percent of the devices that are potentially the most dangerous (Class III) enter the market on the basis of a claim by the manufacturer that they are 'substantially equivalent' to a device already on the market. Although a determination of substantial equivalence involves a review by FDA of what is known of the safety and effectiveness of the devices, and may even include some additional clinical testing, it is not equivalent to an approval by the FDA of the device's safety and effectiveness.

Second, the FDA has experienced difficulty in learning about serious problems with devices. The GAO has found that hospitals often do not report potentially hazardous medical devices to the FDA or the manufacturer.

Finally, even when the FDA has discovered a serious health hazard associated with a medical device, the Agency faces a unique barrier to enforcing important administrative remedies. Unlike other health and safety agencies, FDA may not take

administrative action to order a defective device recalled unless it can show that the device did not meet the 'state-of-the-art' at the time it was designed and manufactured." H.R. Rep. No. 101-808, 101st Cong., 2d Sess. (1990).

The apparent inability of the agency to investigate, to issue approval, and to monitor compliance suggests that it should not be the sole source of protection for the consumers of this country. In fact, it seems almost a perversion of the protective principle to suggest that laws such as the 1976 Medical Device Amendments, whose purpose is to assure the "safety and effectiveness of medical devices intended for home use" (H.R. Conf. Rep. No. 94—1090, 94th Cong., 2d Sess., at 51 (1976), cited in An Analytical Legislative History, appendix II, at 51), destroyed in one stroke all the potential safety benefits of all tort litigation in all 50 states.

As strange as such an action might seem to some, we agree that the Constitution's supremacy clause gives Congress the power to do just that. But we cannot agree that a single statement by the Commissioner, a statement that goes well beyond the statute itself and is contrary to every other regulation promulgated by that same Commissioner, reflects "the clear and manifest purpose of Congress." *Cipollone*, 505 U.S. at 516, 120 L. Ed. 2d at 422, 112 S. Ct. at 2617.

If the framers' concern with the stresses of compromise and the nation's convulsive upheaval of resolution are to be given their appropriate meaningfulness, if the common law claims of 200 years are to be curtailed, if the courts of the States are to be deprived of deciding the cases that have been their historical province, if the supremacy clause is to mean preemption *uber alles*, then let the execution of the tort system be public. Let the sword of supremacy be wielded by Congress in the full light of day; let not its death be dealt in the dark, let it not be bled dry by a bureaucrat's blade.

We conclude that Congress did not intend to preempt common law decisions by passing the 1976 Medical Device Amendments. Even if we were to assume that Congress and the Commissioner intended to preempt common law decisions in this area, both the statute and the regulation defendants rely upon to support preemption contain exceptions to preemption. As indicated earlier, subsection 360k(b) allows the secretary to exempt requirements from preemption. Section 808.1 parallels the statutory language and then amplifies it:

"(d) State or local requirements are preempted *only* when the Food and Drug Administration has *established specific counterpart regulations* or there are specific requirements applicable ***, thereby making any existing divergent State or local requirements *** different from, or in addition to, the *specific* Food and Drug

Administration requirements." (Emphasis added.) 21 C.F.R. § 808.1(d) (1994).

Finally, the FDA has also endorsed this conclusion. In its explanatory statements published at the time of the adoption of the regulations, it states:

"Thus, from a plain reading of section 521 of the act it is clear that the scope of *preemption is limited to instances where there are specific F.D.A. requirements* applicable to a particular device \*\*\*." (Emphasis added.) 43 Fed. Reg. 18662 (1978).

"There is *nothing* in the legislative history to *indicate Congress intended* that the amendments should result in *less protection for the public* which would be the natural consequences of State Controls being eliminated during the considerable period of time it will take for F.D.A. to implement fully the new authorities provided in the Amendments." (Emphasis added.) 43 Fed. Reg. 18663 (1978).

In this case defendants presented no evidence of any specific counterpart regulation or any other specific requirement that would have preempted the court's decision. Since defendants have the burden of proof on the issue of preemption, and since no evidence was presented to establish a specific requirement, defendants have failed to meet their burden of proof on the issue.

There are other important issues raised by defendants, but they will of necessity be addressed in an unpublished portion of this disposition. See Supreme Court Rule 23(c)(2) (Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23(c)(2), eff. July 1, 1994).

In conclusion, we hold that the order of the circuit court is affirmed.

Affirmed.

MAAG and GOLDENHERSH, JJ., concur.