*693 P.2d 895*

**Philip V. EDSALL, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF PIMA; Hon. Norman S. Fenton, a judge thereof, and Ruth E. EDSALL, the real party in interest, Respondents.**

**No. 17561–PR.**

Supreme Court of Arizona,
In Banc.

Dec. 13, 1984.

Waterfall, Economidis, Caldwell & Hanshaw by W. Patrick Traynor, John C. Rambow, Tucson, for petitioner.

Whitehill, Stolkin, Karp, West, Weiss & Berger by Leonard Karp, Elaine Hardin, Tucson, for respondents.

Wallace R. Hoggatt, Douglas, and David P. Flannigan, Bisbee, for amicus curiae Helen K. Garrett.

GORDON, Vice Chief Justice:

Petitioner Philip Edsall and respondent Ruth Edsall were married on September 25, 1959. At that time Phil was a member of the United States Air Force and continued on active duty during the marriage. Phil and Ruth were divorced in 1981. A separation agreement was entered into between the parties and incorporated into the decree of dissolution entered on December 7, 1981. The agreement provided that respondent was not entitled to any of the military retirement pension that petitioner would eventually receive from the government. This agreement was consistent in that regard with *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981) [decided June 26, 1981], which held that there were no community property rights in military retirement benefits because the consequences of the community property interest injures the objectives of the federal laws that created the military retirement program. *McCarty* directly overruled *Van Loan v. Van Loan*, 116 Ariz. 272, 569 P.2d 214 (1977) and *Neal v. Neal*, 116 Ariz. 590, 570 P.2d 758 (1977) which held that military retirement pay is community property to the extent that such property is earned through community effort. Effective February 1, 1983 Congress passed the "Uniformed Services Former Spouses Protection Act" Pub.L. No. 97–252 passed by Congress and signed by the President on September 8, 1982 and now codified in 10 U.S.C. § 1408 (1983) [hereinafter referred to as "the Act"] which made

military retirement benefits subject to state community property laws. The Act legislatively overruled *McCarty* and was retroactive to the date of the *McCarty* decision.

On April 22, 1983, about three months after passage of the Act, Ruth filed a petition for Order to Show Cause, wherein she sought a court order to set aside the parties' divorce decree and to determine that, pursuant to the Act, she had an interest in Phil's retirement benefits. Phil responded by filing a Motion to Dismiss seeking to dismiss the portion of the petition for Order to Show Cause relating to the disposition of military retirement benefits. Following a hearing including testimony and oral argument on the motion to dismiss, the trial judge granted Ruth's petition for Order to Show Cause reopening the Decree of Dissolution of Marriage and ruled that the entire disposition of assets, including retirement benefits, be reconsidered.

A special action was filed by Phil in the Court of Appeals, Division Two, concerning the reopening. The Court of Appeals held that the final divorce decree could not be reopened due to *res judicata*. The court also found that the parties had intended all of Phil's military retirement income to be his regardless of any subsequent changes in the law. Phil was awarded costs in the amount of $161.00 and attorneys' fees in the amount of $3,322 on appeal and $4,000 in the trial court.

Ruth petitioned this Court for review of the Court of Appeals' opinion. Because this case presents an issue of first impression in this state, we granted the petition. Ruth also requested review of the costs and attorneys' fees award. The opinion of the Court of Appeals, *Edsall v. Superior Court*, 143 Ariz. 287, 693 P.2d 942 (App. 1984) is vacated. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Ariz.R.Civ.App. P. 23.

Three issues are presented for review:

1. Whether the Court of Appeals erred *in* holding that decrees entered into and finalized between June 26, 1981 and February 1, 1983 could not be modified under the terms of the Uniformed Services Former Spouses Protection Act, 10 U.S.C. § 1408 (1983).

2. Whether the Court of Appeals erred in finding that the parties intended that Phil's military retirement income would be Phil's regardless of any change in the law.

3. Whether the Court of Appeals erred in setting aside its award of attorney's fees in favor of Phil.

## MILITARY RETIREMENT BENEFITS

### I

The first issue we must decide is whether the trial court has the power to set aside a divorce decree based upon a negotiated separation agreement finalized after the *McCarty* decision but prior to the "Uniformed Services Former Spouses Protection Act." The applicable section of the Act, 10 U.S.C.A. § 1408(c)(1) reads:

"Subject to the limitations of this section, a court may treat disposable retired or retainer pay payable to a member for pay periods beginning after June 25, 1981, either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court."

We note that the Act itself does not require a division of military retirement income, but rather leaves such a determination to the individual states. Pursuant to the Act, we will again treat military retirement pay as community property to the extent that it was derived from community efforts. *See Van Loan v. Van Loan, supra.* This treatment will be retroactive to the date of *McCarty*.

Phil argues, however, that this application does not apply to decrees that became final during the period between *McCarty* and the Act. Phil contends that Arizona has long recognized the need for finality in family law cases and that changes in community property law do not alter the *res judicata* consequences of a final decree citing *Rodriguez v. Rodriguez*, 133 Ariz. 88, 649 P.2d 291, approved 133 Ariz. 87, 649

P.2d 290 (1982). We believe, however, that there is authority in Arizona that will allow a final divorce decree to be reopened in the limited circumstances presented by this case notwithstanding *res judicata* principles.

A.R.S. § 25–327(A) expressly allows property dispositions to be revoked or modified where the court "finds the existence of conditions that justify the reopening of a judgment under the laws of this state." Rule 60, Arizona Rules of Civil Procedure states the conditions which entitle one to relief from judgments or orders. Specifically, Rule 60(c) provides the vehicle in which the trial court "may relieve a party or his legal representative from a final judgment, order or proceeding" if "it is no longer equitable that the judgment should have prospective application, or (6) any other reason justifying relief from the operation of the judgment." Arizona Rules of Civil Procedure. Rule 60(c)(5) and (6). Rules 60(c)(5) and/or (6) have been used liberally in reopening otherwise final court orders where there has been a change in the law affecting substantial rights of a litigant. *See Smith v. Smith*, 458 A.2d 711 (Del.Fam.Ct.1983); *See, e.g., Theriault v. Smith*, 523 F.2d 601 (1st Cir.1975); *McGrath v. Potash*, 199 F.2d 166 (D.C.Cir. 1952); *Coca Cola Bottling Co. v. Standard Bottling Co.*, 138 F.2d 788 (10th Cir. 1943); *Bailey v. Ryan Stevedoring Co.*, 443 F.Supp. 899 (M.D.La.1978) *rev'd on other grounds*, 613 F.2d 588 (5th Cir.1980); *Harrell v. Harder*, 369 F.Supp. 810 (D.C. Cir.1974); *Griffin v. State Board of Education*, 296 F.Supp. 1178 (E.D.Va.1969); *See generally* 7 Moore's Federal Practice para. 60.26[4] (2d ed. 1983) (breadth of (b)(5) is broad and encompasses any final judgment having prospective application).[1] We note that in applying clause 6 two limitations must be met.

"First, the reason for setting aside the [judgment or order] must *not* be one of the reasons set forth in the five preceding clauses. * * * Second, the 'other reason' advanced must be one which *justifies* relief." (citations omitted) *Webb v. Erickson*, 134 Ariz. 182, 186, 655 P.2d 6, 10 (1982). "We concluded that, to justify relief under clause 6, the facts must go beyond the factors enumerated in clauses 1 through 5 and raise 'extraordinary circumstances of hardship or injustice * * *.' " *Bickerstaff v. Denny's Restaurant, Inc.*, 141 Ariz. 629, 688 P.2d 637 (1984).

The Court in *DeGryse v. DeGryse*, 135 Ariz. 335, 661 P.2d 185 (1983) discussed A.R.S. § 25–327A and Rule 60(c) and provides authority for the trial court to set aside a divorce decree. While finding no circumstances in that particular case to reopen the decree of dissolution, the Court in *DeGryse* recognized that the Act returned the law to its pre-*McCarty* state under *Van Loan v. Van Loan, supra* and *Neal v. Neal, supra* with respect to the division of military retirement benefits upon divorce. The Court noted the need for finality in marriage and family law but stated that the Act constituted "express authorization" for setting aside divorce decrees entered in the *McCarty* interim period. 135 Ariz. at 338, 661 P.2d at 188. Although this language is dicta, its statement, the strong statement of intent by Congress in enacting the Act, and equitable considerations discussed *infra*, constitute "extraordinary circumstances" justifying relief from the judgment.

Congress made it clear that in passing the Act, their intent was to wipe out the effects of *McCarty* on persons divorced in the interim period.

"The purpose of this provision is to place the courts in the same position that they were in on June 26, 1981, the date of the *McCarty* decision, with respect to treatment of non-disability military retired or retainer pay. The provision is intended to remove the federal pre-emption found to exist by the United States

---

1. Rule 60(c) of the Arizona Rules of Civil Procedure is taken from Rule 60(b) Federal Rules of Civil Procedure.

Supreme Court and permit State and other courts of competent jurisdiction to apply pertinent State or other laws in determining whether military retired or retainer pay should be divisable. Nothing in this provision requires any division; it leaves that issue up to the courts applying community property, equitable distribution or other principles of marital property determination and distribution. This power is returned to the courts retroactive to June 26, 1981. This retroactive application will at least afford individuals who were divorced (or had decrees modified) during the interim period between June 26, 1981 and the effective date of this legislation the opportunity to return to the courts to take advantage of this provision."

1982 U.S. Code Cong. & Ad News 1555, 1611.

Additionally, we believe that it is not equitable to deny the non-working military spouse the right to share in the fruits that his/her community labor has brought to the community. Congress in its research of the problem discovered that the military spouse often has more responsibility for the child care and management of the family household and often times gives up the opportunity to pursue an individual career. The Committee report which accompanied the bill stated at page 7:

### "THE MILITARY SPOUSE

"The committee received extensive testimony from the uniformed services and public witnesses on the contributions and sacrifices made by the military spouse throughout the service member's career. A recurrent recruiting point that is made to a military couple from the time of the spouse's initial entry into the military is that the spouse is a partner in the member's career. The theme of the 'military family' and its importance to military life is widespread and well publicized. Military spouses are still expected to fulfill an important role in the social life and welfare of the military community. Child care and management of the family household are many times solely the spouse's responsibility. The military spouse lends a cohesiveness to the family facing the rigors of military life, including protracted and stressful separations. The committee finds that frequent change-of-station moves and the special pressures placed on the military spouse as a homemaker make it extremely difficult to pursue a career affording economic security, job skills and pension protection. Therefore, the committee believes that the unique status of the military spouse and that spouse's great contribution to our defense require that the status of the military spouse be acknowledged, supported and protected."

*Id.* at 1601.

The Delaware Court in *Smith v. Smith*, 458 A.2d 711 (Del. Family Ct. 1983) determined that, in view of the Act and congressional intent, a final divorce decree entered during the interim period could be reopened. *See also Castiglioni v. Castiglioni*, 192 N.J. Super. 594, 471 A.2d 809 (1984); *Faught v. Faught*, 312 S.E.2d 504 (N.C.App.1984); *Gordon v. Gordon*, 659 S.W.2d 475 (Tex.App.1983). *Cf. In Re Ankenman*, 142 Cal.App.3d 833, 191 Cal. Rptr. 292 (1983); *In Re Hopkins*, 142 Cal. App.3d 350, 191 Cal.Rptr. 70 (1983) (cases not final when *McCarty* decided but pending upon effective date of the Act.) In reaching its conclusion the court in *Smith* balanced the equities against the principles of *res judicata* stating:

"The Court understands and generally agrees with the argument advanced by counsel for the Husband that, in general, final court orders should only be vacated where the reasons are substantial. But in this case the law of Delaware prior to *McCarty* was that all pension rights were to be treated as marital property. *McCarty* had the effect of changing Delaware law by carving out an exception for military pensions only. Congress thereupon, legislatively vacated *McCarty* and clearly indicated an intention that persons who had been wronged by *McCarty* could reopen their cases if per-

mitted under state law. A decision to reopen this case is simply a decision to permit the Wife to come in and present her case under Delaware law as it existed before *McCarty* and as it has existed for litigants whose cases were heard after *McCarty*. To do otherwise would be to carve out a category of people whose cases happened to be decided between June 25, 1981 and September 8, 1982 and deprive them of substantial property interests which all other similarly-situated litigants have been awarded."

450 A.2d at 714–15.

Similarly the Court in *In Re Hopkins, supra,* noted the inequities that would result in not applying the Act retroactively:

"The question as to whether retroactive application of the Act could produce substantial inequitable results is the easiest to answer—the *non-application* of the Act would produce inequitable results.

"Not to apply the Act retroactive to June 25, 1981, would yield far more problems than would any mechanical application of a calendar-determining set of laws. To allow cases decided, but not yet final, either before or during the relatively short interval of *McCarty* to be subject to the *McCarty* rule would carve out of the many persons entitled to military pensions a fortunate or unfortunate few who had substantial rights determined by the vagaries of the calendar. It would create a gap of some 20 months in which their future entitlements were or were not to be determined in a manner different from the 40 years before or the indefinite future after. Most importantly, it would allow the happenstance of the calendar to thwart the meaning of Congress when the Congress did quickly and affirmatively act to clearly and fully make these pension rights subject to the state's control. Indeed, not to apply the Act retroactively would be to thwart the very title of the Act, the "Uniformed Services Former Spouses' Protection Act."

142 Cal.App.3d at 359–60, 191 Cal.Rptr. at 77 (emphasis in original).

Phil points to the case of *Rodriguez v. Rodriguez, supra.* In *Rodriguez* we held that *McCarty* did not change the *res judicata* consequences of a divorce decree which was final before *McCarty* and thus we vacated and set aside an order of the superior court striking a pre-*McCarty* divorce judgment provision which awarded a share of husband's Air Force retirement benefits to his wife. Phil argues the same *res judicata* principle expressed in *Rodriguez* should apply in this case to bar reopening of a divorce decree finalized between *McCarty* and the Act. We disagree because *Rodriguez* is distinguishable from the case at bar.

First, as noted by the Court in *Rodriguez,* there was no manifested intent by the United States Supreme Court that *McCarty* apply retroactively.

".* * * Nothing in *McCarty* suggests that the Supreme Court therein intended to invalidate, or otherwise render unenforceable, prior valid subsisting state court judgments. Absent some indication of such an intent, we decline to do so."

133 Ariz. at 89, 649 P.2d 292 quoting *Erspan v. Badgett,* 659 F.2d 26, 28 (5th Cir. 1981). Second, in *Rodriguez* the equities militated against reopening a pre-*McCarty* finalized divorce decree. The Court in *Rodriguez* noted that

"* * * [t]o permit adjudications which have become final to be reopened so as to award military retirement pay to the husband as his separate property would * * upset settled property distributions on which parties have planned their lives and be devastating, not only from the standpoint of the litigants, but in terms of the workload of the courts."

*Rodriguez v. Rodriguez, supra,* 133 Ariz. at 89, 649 P.2d at 292. In pre-*McCarty* final divorce judgments, the refusal to reopen merely allowed both spouses to keep a proportionate share of the retirement benefits that were earned during the marriage partnership through their community la-

bor—a result which is patently equitable in our eyes. However, denying reopening of a divorce decree finalized during the interim period would take from the spouse a "community" asset which she expended community labor to procure that may be a preponderance of the assets earned during the marriage.

Furthermore, the interim period between *McCarty* and the Act was short, only about 18 months. The number of divorces during that period which involved military personnel and military retirement pay in Arizona is small. Thus there is not likely to be a flood of ex-spouses applying to the Court requesting reopening of their divorce decrees adding significantly to the workload of the courts.

■ Because of the intent of Congress and the equities discussed above, we believe that the trial court had the power to reopen a final divorce decree where the parties relied on *McCarty* in disposing of military retirement benefits.

## II

The second major issue presented is whether the Court of Appeals erred in finding that the parties intended that their military retirement income would be Phil's regardless of any change in the law.

During the hearing on the Order to Show Cause, the trial court took testimony to determine the intent of the parties in disposing of the retirement benefits. The reporter's transcript, however, was not made part of the record in this special action. The trial court held that under the factual circumstances the entire issue of property disposition should be relitigated and the decree reopened. The court based this decision on a factual finding that the parties entered into the "Separation Agreement after the *McCarty* decision in which the wife thought she had no alternative or claim to the husband's military benefits." Thus the trial court apparently based its interpretation of the separation agreement on extrin-

sic evidence and not solely on an interpretation of the document as a question of law.

The Court of Appeals disagreed and instead concluded that the "language shows the parties intended that all of the military retirement income would be [Phil's], regardless of any change in the law." *Edsall v. Superior Court, supra,* 143 Ariz. at 242, 693 P.2d at 897. The Court of Appeals apparently based this conclusion solely on the language in the separation agreement determining the intent from the four corners of the instrument as a matter of law. Thus the Court of Appeals determined that the language was unambiguous and susceptible to only one interpretation.

In the settlement agreement, paragraph 12 of exhibit A and paragraph 5 of exhibit B distribute the military benefits. Paragraph 12 sets out the award of military benefits to Ruth and reads:

"12. All benefits incident to or in connection with PHIL'S service in the military which RUTH may hereinafter become entitled to as a result of future or pending legislation by the Congress or any other legislative body, except that RUTH shall not have any right to any portion of PHIL'S military retirement income, the entirety of which PHIL shall receive as his sole and separate property pursuant to the terms of Exhibit B herein."

Paragraph 5 of Exhibit B set forth Phil's award on military benefits:

"5. All Rights to PHIL'S military retirement income."[2]

After reading this language we agree with the Court of Appeals that the language disposing of military retirement benefits has only one plain meaning. Paragraph 12 gives Ruth all military benefits that may result from changes in the law except military retirement benefits. Any other interpretation strains the plain and ordinary flow and meaning of the language. The word "except" ties the disposition of military retirement benefits in the latter part of paragraph 12 to the first part

---

2. Paragraph 5 was amended to read as above and initialed by both parties. Paragraph 5 prior

to this amending read: "5. All PHIL'S sole and separate military retirement income."

of paragraph 12 which disposes of all other military benefits. Since the first part of paragraph 12 dealing with "[a]ll benefits incident to or in connection with PHIL'S service in the military" disposes of benefits arising from pending or future legislation, the exception dealing with retirement bene-· fits also disposes of benefits arising from future or pending legislation.

■ This interpretation of paragraph 12 is bolstered by the amendment to paragraph 5. Prior to the amendment paragraph 12 gave Phil: "ALL PHIL'S sole and separate military retirement income." Paragraph 5 was thereafter amended to read as above and initialed by both parties. This change indicates to us that Phil was not merely to receive military benefits that were his separate property, but all rights to military retirement whether it was his separate property or community property. Military retirement benefits could only again become community property as a result of future congressional legislation overruling *McCarty.* We thus hold that by the plain language of the separation agreement, Ruth waived all her future rights to military retirement benefits.

## ATTORNEY'S FEES

The last issue we must decide is whether the Court of Appeals erred in setting aside its award of attorney's fees in favor of Phil.

In an order filed on May 17, 1984, the Court of Appeals granted Phil's request for "costs on appeal in the sum of one hundred sixty-one and no/100 dollars ($161.00) and awarding attorney's fees on appeal in the sum of three thousand three hundred twenty-two and no/100 dollars ($3,322.00)" and "attorney's fees in the trial court in the sum of four thousand and no/100 dollars ($4,000.00)." About one month later on June 27, 1984 the Court of Appeals set aside and vacated its previous decision

awarding attorney's fees on appeal and in the trial court.

Phil relies on paragraph 21 in the separation agreement in arguing that he is entitled to attorney's fees. Paragraph 21 reads as follows:

"21. DISPUTES. This agreement shall be construed and governed in accordance with the laws of the State of Arizona. Should a dispute arise between PHIL and RUTH in regard to this Agreement requiring them, or either of them, to employ an attorney to enforce their rights, titles and interests under this Agreement, the prevailing party shall be awarded reasonable attorney's fees and costs incurred."

Phil's argument was based on the fact that he was the "prevailing party" at the Court of Appeals level and now the Supreme Court.

We believe, however, that the provision in the settlement agreement entitling the prevailing party to reasonable attorney's fees does not control the trial court's discretion to grant or deny attorney's fees to either party in a domestic relations case. Instead A.R.S. § 25–324 governs an award of attorney's fees notwithstanding a provision relating to such fees in the separation agreement incorporated into a divorce decree.[3] A.R.S. § 25–324 reads as follows:

"§ 25–324. Attorney's fees

"The court from time to time, after considering the financial resources of both parties, may order a party to pay a reasonable amount to the other party for the costs and expenses of maintaining or defending any proceeding under this chapter. For the purpose of this section costs and expenses may include attorney's fees, deposition costs and such other reasonable expenses as the court finds necessary to the full and proper presentation of the action, including any appeal. The court may order all such amounts paid directly to the attorney, who may

---

3. Since the Court of Appeals vacated its attorney's fees award after denying reopening of the divorce decree in favor of Phil, it obviously did not base its denial on the settlement agreement.

Rather, the court must have relied on A.R.S. § 25–324 and *In re Gubser,* 126 Ariz. 303, 614 P.2d 845 (1980).

enforce the order in his name with the same force and effect, and in the same manner, as if the order had been made on behalf of any party to the action."

*In re Gubser*, 126 Ariz. 303, 614 P.2d 845 (1980) contained a similar provision for an award of attorney's fees to the successful parties.[4] The court held that provision for costs and attorney's fees in the property settlement agreement is superseded by A.R.S. §§ 25–324 and 25–332(C), which require a Court to consider the parties relative financial position and whether the suit for modification was brought in good faith prior to making an award. In explaining its holding, the court stated:

"It is apparent that the award of costs and attorney's fees pursuant to statute is based upon very different considerations than those contemplated by the property settlement agreement. Section 25–324 provides for a discretionary award of a reasonable amount for costs and expenses based upon the financial resources of the parties. *See, e.g., Baum v. Baum*, 120 Ariz. 140, 584 P.2d 604 (App.1978). Section 25–332 C protects the party with custody from harassing and vexatious attempts to modify the decree.

"The property settlement agreement provides for a mandatory award of reasonable costs and attorneys' fees to the successful party. The award is to be made without regard to the relative financial positions of the parties and without consideration of whether the suit was brought in good faith.

"We believe that the provisions of § 25–324 manifest a policy of permitting a party with a legitimate claim or defense to maintain an action concerning the dissolution of marriage despite his or her limited financial means. The attorneys' fees provision of the separation agreement undermines that policy. *Under the agreement, a party of limited means with an arguably valid claim or defense would be very hesitant to engage in litigation if his or her prospects of success were at all uncertain.* Moreover, an award of costs and attorneys' fees based on success is especially inappropriate where the proceedings are not a contest over disputed property or a right to damages but an attempt to determine the best interests of the children."

126 Ariz. at 304–05, 614 P.2d at 846–47 (emphasis added).

■ Even though *Gubser* involved a dispute over child custody, we believe the same policy considerations espoused by *Gubser* apply here. A property award is essentially permanent; the well established rule is that property settlements cannot be modified or terminated. An ex-spouse seeking to modify a property disposition can attempt to do so under a narrow exception in A.R.S. § 25–327 which allows modification if the Court finds the existence of conditions that justify reopening of a judgment under the laws of this State. Faced with the burdensome task of overcoming this obstacle and thus potential liability for thousands of dollars in attorneys fees, the spouse of limited financial resources will more likely forego whatever rights in property he or she may have than chance litigation and financial disaster. In order to foster the policy behind A.R.S. § 25–327, the spouse with a legitimate claim should be able to assert that claim without being financially intimidated.

■ Additionally, we note that A.R.S. § 25–324 was drafted in broad language and is not limited to child custody cases. The language indicates that the court may order a party to pay costs and expenses for "maintaining or defending *any proceedings* under this chapter." A.R.S. § 25–324 (emphasis added). The primary focus of this section is on the relative ability of the parties to pay costs incurred in the proceed-

4. The property settlement agreement provided: "Subsequent to the dissolution of this marriage, should it become necessary for either party to engage in Court litigation to attempt to modify the provisions of this Agreement in any fashion, the successful party shall be entitled to his or her reasonable attorney's fees and costs."

ings and does not require the party requesting attorneys fees to have prevailed on appeal. This statute was designed to assure the poorer party a remedy. *See Countryman v. Countryman,* 135 Ariz. 110, 659 P.2d 663 (Ariz.App.1983); *In re Gubser, supra, Olsztyn v. Olsztyn,* 20 Ariz.App. 545, 514 P.2d 498 (1973); *Reich v. Reich,* 13 Ariz.App. 98, 474 P.2d 457 (1970).

■ We thus find that A.R.S. § 25–324 overrides the provision in the property settlement agreement awarding attorneys' fees solely on the basis that one is the prevailing party and we set aside the award of attorneys' fees. Additionally, the order of the trial court granting the new trial is set aside. Because we disagree with the reasoning of the Court of Appeals, the opinion of the Court of Appeals is vacated.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.