1998-NMCA-036

955 P.2d 683

**Dora D. HENNESSY, F/K/A Dora D. Duryea, Petitioner–Appellee,**

v.

**George W. DURYEA, Respondent–Appellant.**

No. 17317.

Court of Appeals of New Mexico.

Jan. 14, 1998.

Certiorari Denied Feb. 18, 1998.

Robert Marcotte, Albuquerque, for Petitioner-Appellee.

Eileen Mallon, Clara Ann Bowler, Travis M. Scott, Jr., Albuquerque, for Respondent-Appellant.

*OPINION*

PICKARD, Judge.

1. George Duryea (Husband) appeals from the trial court's order of February 16, 1996, awarding a share of his military retire-

ment pay to his former wife, Dora Hennessy (Wife). Husband asserts that the trial court erred in making this award because: (1) Husband and Wife were not residents of New Mexico during the time he earned most of his pension benefits; (2) the military retirement pay was not divisible under the laws of New Jersey or New Mexico at the time of the parties' 1973 divorce decree; (3) such an award is preempted by the Uniformed Services Former Spouses' Protection Act (USFSPA); and (4) Wife's claim is barred by the statute of limitations and the doctrine of laches. We hold that the award is preempted and therefore do not reach the other issues.

## I. BACKGROUND

2. Husband enlisted in the Navy in 1958 and retired from military service in September 1988. Husband and Wife were married in New Mexico on January 30, 1960, and divorced in New Mexico on April 27, 1973. The 1973 divorce decree states that the parties have consented to the jurisdiction of the Bernalillo County district court and adopts as its findings of fact the material allegations of the complaint. The 1973 divorce decree divided household effects and two vehicles. The decree is silent with respect to military retirement benefits.

3. On March 7, 1991, approximately two and one-half years after Husband retired from the military and eighteen years after the divorce, Wife filed a petition in Bernalillo County district court to divide what she alleged was her undivided community interest in the military retirement pay that Husband was then receiving. Wife brought her petition pursuant to the provisions of NMSA 1978, Section 40-4-20(A) (1993), which provides to a party the right to seek division and distribution of previously undivided property in a separate proceeding after a divorce. Husband objected to the application of this statute on the grounds that it does not satisfy the reservation-of-jurisdiction requirement in Paragraph 1408(c)(1) of USFSPA, 10 U.S.C. § 1408(c)(1) (1994).

4. On February 19, 1996, the trial court granted Wife's petition, ordering Husband to pay Wife 22% of Husband's future retirement pay and arrearages of $52,235.52. The trial court found that the parties resided in New Mexico during their marriage and concluded that Wife would be entitled to a portion of Husband's military retirement pay under the laws of either New Mexico or New Jersey. This appeal followed.

## II. DISCUSSION

### Federal Preemption

5. Husband asserts that Paragraph 1408(c)(1) of USFSPA bars the application of state law in cases where a pre-*McCarty* divorce decree does not contain specific language that treats (or reserves jurisdiction to treat) military retirement pay as the property of a service member and his former spouse. The 1973 divorce decree at issue in this case does not contain such specific language. We agree with Husband.

6. Under the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, federal preemption of state law may be "explicitly mandated by Congress, compelled due to an unavoidable conflict between the state law and the federal law, or compelled because the state law is an obstacle to the full accomplishment of congressional objectives." *In re Timberon Water Co.*, 114 N.M. 154, 158, 836 P.2d 73, 77 (1992) (citations omitted). "When Congress has considered the issue of preemption and has included in the legislation a provision expressly addressing the issue," we need only identify the domain expressly preempted by the federal statute and may infer that matters beyond that domain are not preempted. *Montoya v. Mentor Corp.*, 1996 NMCA 067, ¶ 8, 122 N.M. 2, 919 P.2d 410.

7. Insofar as federal preemption presents a question of statutory interpretation, that question is reviewed *de novo* and does not require us to defer to the statutory interpretation of the district court. *Cf. Cox v. Municipal Boundary Comm'n*, 120 N.M. 703, 705, 905 P.2d 741, 743 (Ct.App.1995) (stating standard of review for question of statutory interpretation). "To understand a statute's meaning, we must examine the words used, the context within which the words are used, the purpose of the statute,

and its legislative history." *Montoya*, 1996 NMCA 067, ¶ 17, 122 N.M. 2, 919 P.2d 410.

8. The context in which the statutory words are used is particularly important here. Because domestic relations provide a context in which state law is preeminent, the United States Supreme Court has "consistently recognized that Congress, when it passes general legislation, rarely intends to displace state authority in this area." *Mansell v. Mansell*, 490 U.S. 581, 587, 109 S.Ct. 2023, 2028, 104 L.Ed.2d 675 (1989); *see also Boggs v. Boggs*, 520 U.S. 833, ——, 117 S.Ct. 1754, 1760, 138 L.Ed.2d 45 (1997) (noting that "community property laws ... implement policies and values lying within the traditional domain of the States"). Hence, in the context of domestic relations, courts "will not find pre-emption absent evidence that it is positively required by direct enactment." *Mansell*, 490 U.S. at 587, 109 S.Ct. at 2028 (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979)).

9. Examining the language and legislative history of USFSPA in this context, we find that Congress "positively required" state law to be preempted in this case. We begin our analysis by placing Paragraph 1408(c)(1) in historical context. Prior to 1981, several community property states had held that military retirement benefits are community property, so that after divorce the non-military spouse would be entitled to a share of the benefits. The New Mexico Supreme Court so held in 1969. *See LeClert v. LeClert*, 80 N.M. 235, 236, 453 P.2d 755, 756 (1969). In 1981, however, the United States Supreme Court ruled that those decisions were wrong. In *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), the Court held that as a matter of federal law, military retirement benefits were the property of solely the military spouse. In the language of community-property law, *McCarty* meant that military retirement benefits were, and always had been, the separate property of the military spouse. Despite the presumption against pre-emption in the context of domestic relations, the United States Supreme Court found that state law with

respect to the division of military retirement benefits was preempted.

█ 10. Even though *McCarty* overturned *LeClert*, pension benefits that had been divided in reliance on *LeClert* were, for the most part, not affected. Changes in the law ordinarily are not grounds for setting aside final decisions. *See Deerman v. Board of County Commissioners*, 116 N.M. 501, 505–06, 864 P.2d 317, 321–22 (Ct.App.1993). Accordingly, final decisions that had awarded part of the military pension to the non-military spouse were not set aside. *See Whenry v. Whenry*, 98 N.M. 737, 738, 652 P.2d 1188, 1189 (1982). In other words, *McCarty* would apply only to future cases or cases still pending, either in the trial court or on appeal.

11. In response to *McCarty*, the United States Congress in 1982 enacted the USFSPA. Paragraph 1408(c)(1) originally stated in its entirety:

A court may treat disposable retired or retainer pay payable to a member for pay periods beginning after June 25, 1981, [the day prior to the *McCarty* decision] either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court.

The purpose of USFSPA is " 'to remove the federal pre-emption found to exist by the United States Supreme Court [in *McCarty*, 453 U.S. 210, 101 S.Ct. 2728], and permit State and other courts of competent jurisdiction to apply pertinent State or other laws in determining whether military retired or retainer pay should be divisable [sic].' " *Walentowski v. Walentowski*, 100 N.M. 484, 486, 672 P.2d 657, 659 (1983) (quoting S.Rep. No. 97–502, at 16 (1982)), *reprinted in* 1982 U.S.C.C.A.N. 1596, 1611; *see also* H.R.Conf. Rep. No. 97–749, at 165 (1982), *reprinted in* 1982 U.S.C .C.A.N. 1569, 1570 (stating that the legislation "would have the effect of reversing the decision of the United States Supreme Court in the case of *McCarty* ").

12. The question arises as to the effect of this statute on final judgments. Some jurisdictions interpreted the USFSPA as authorizing the reopening of final divorce decrees entered during the eighteen-month period between the *McCarty* decision and the effec-

tive date of the USFSPA. *See Edsall v. Superior Court,* 143 Ariz. 240, 693 P.2d 895, 897–901 (1984) (en banc) (noting "extraordinary circumstances" justifying relief and the small number of cases in the interim period); *cf. Koppenhaver v. Koppenhaver,* 101 N.M. 105, 108–09, 678 P.2d 1180, 1183–84 (Ct.App. 1984) (remanding denial of post-judgment motion for consideration on similar grounds); *but cf. Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (separation-of-powers principles prohibited Congress from enacting a statute extending the limitations period for actions that had become final prior to enactment of the statute). But final judgments can be reopened only in very limited circumstances, *see* Rule 1–060, NMRA 1997, and courts apparently did not routinely reopen pre-*McCarty* final decrees after enactment of the USFSPA. *See generally Johnson v. Johnson,* 824 P.2d 1381, 1382 n. 2 (Alaska 1992) (noting obstacles to seeking relief under Alaska counterpart to Rule 1–060 with respect to division of military pension).

13. There is, however, a subtlety that complicates the picture. What appears on its face to be a final decree—because all issues litigated by the parties have been decided and the decree reserves no issues for future decision—may, under the laws of some jurisdictions, still be subject to reopening (without the need for showing the sort of equitable grounds codified in Rule 1–060). For example, in New Mexico even after entry of a final decree, a former spouse can bring an action to obtain a share of marital community property that was not addressed in the decree. The right to bring such an action is set forth in a long-standing statute, Section 40–4–20, which states:

> The failure to divide or distribute property on the entry of a decree of dissolution of marriage or of separation shall not affect the property rights of either the husband or wife, and either may subsequently institute and prosecute a suit for division and distribution or with reference to any other matter pertaining thereto that could have been litigated in the original proceeding for dissolution of marriage or separation. ·

Under New Mexico divorce law, Section 40–4–20(A) becomes part of a divorce decree by operation of law. *See Zarges v. Zarges,* 79 N.M. 494, 495, 445 P.2d 97, 98 (1968) (statute confers jurisdiction on district court to hear subsequent, independent action to divide property left undivided in divorce decree): *Scanlon v. Scanlon,* 60 N.M. 43, 49, 287 P.2d 238, 242 (1955) (State's domestic relations statutes become part of divorce decree). Thus, if a military retirement benefit is not dealt with in the divorce decree, a spouse claiming an interest in the pension benefits may seek relief years later pursuant to Section 40–4–20(A). *See Plaatje v. Plaatje,* 95 N.M. 789, 790, 626 P.2d 1286, 1287 (1981). The 1982 version of the USFSPA does not specifically address this situation.

14. In 1990, however, Congress amended the USFSPA so that Paragraph 1408(c)(1) now reads:

> Subject to the limitations of this section, a court may treat disposable retired pay payable to a member for pay periods beginning after June 25, 1991, either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court. *A court may not treat retired pay as property in any proceeding to divide or partition any amount of retired pay of a member as the property of the member and the member's spouse or a former spouse if a final decree of divorce, dissolution, annulment, or legal separation (including a court ordered, ratified, or approved property settlement incident to such decree) affecting the member and the member's spouse or former spouse (A) was issued before June 25, 1981, and (B) did not treat (or reserve jurisdiction to treat) any amount of retired pay of the member as property of the member and the member's spouse or former spouse.*

In our view, this provision resolves the question left open by the earlier version of the statute. It states that the non-military spouse is not entitled to a share of the pension if a final decree was entered before the date of the *McCarty* decision unless the decree provided that the non-military spouse was entitled to a share of the pension or the

decree reserved jurisdiction to determine whether the non-military spouse was entitled to a share of the pension. We emphasize that the statute requires the *decree* to "reserve jurisdiction to treat" a portion of the pension as property of the non-military spouse. Even though New Mexico court decisions may state that every decree (implicitly) incorporates relevant New Mexico domestic relations statutes, *see Scanlon,* 60 N.M. at 49, 287 P.2d at 242, the language of Paragraph 1408(c)(1) does not permit such implicit incorporation. In short, under the amended USFSPA, the non-military spouse cannot utilize Section 40–4–20 to obtain a share of a military pension if the final decree of divorce was entered before June 25, 1981, and the decree was silent on the question.

15. Indeed, unless that is the meaning of the 1990 amendment to Paragraph 1408(c)(1), it is difficult to discern a useful purpose for the amendment. In a jurisdiction whose law did not include something akin to Section 40–4–20, after a final decree had been entered, a former spouse could not bring a later action seeking a share of a military pension absent an extraordinary circumstance justifying equitable relief, such as, say, fraudulent concealment of the pension by the military spouse or entry of the decree by a court without jurisdiction. *See* Rule 1–060(B). We think it highly unlikely that such relief was being granted routinely by state courts in 1990 (the date of the amendment to Paragraph 1408(c)(1) with respect to decrees entered before June 25, 1981. And we question whether Congress would see fit to enact legislation just to preclude relief in such exceptional cases.

16. The dissent states that

Congress generally intended to stop state courts from reopening divorce decrees for the purpose of taking property rights in military retired pay from an individual and transferring those rights to his or her former spouse when such rights already had become the *separate property* of that individual either by operation of state law or as a result of express language in a pre-*McCarty* divorce decree.

In our view, that was essentially the result under the 1982 version of the USFSPA. No amendment was needed in 1990 to accomplish that result. The compelling inference is that the purpose of the 1990 amendment was to preclude use of Section 40–4–20 or the like to reopen a pre-*McCarty* decree and distribute military pension benefits to the non-military spouse.

17. Also in support of this view of the 1990 amendment, Husband points to Congressional committee reports indicating that Paragraph 1408(c)(1) was adopted because states were allowing the reopening of pre-*McCarty* decrees. The report of the House Committee enacting amended Paragraph 1408(c)(1) states:

The Uniformed Spouses' Protection Act (USFSPA) (Public Law 97–252) was the product of substantial compromise among a wide diversity of opinions about the extent to which state courts ought to be able to divide military retired pay upon the divorce of a military member entitled to such pay. The legislation walks a narrow line between the rights of the states and the interests of the federal government in dealing with military retired pay in divorce settlements. The two modifications to current law the committee would make this year reflect a public policy judgment on the appropriate role of the federal government in limiting state court jurisdiction in divorce cases involving military retired pay that is consistent with the balancing of state and federal interests that has been the hallmark of this law since its inception.

*See* H.R.Rep. No. 101–665, at 279, *reprinted in* 1990 U.S.C.C.A.N. 3004–05 (1990).

18. The House Committee explicitly noted that

some state courts have been less than faithful in their adherence to the spirit of the law. The reopening of divorce cases finalized before the Supreme Court's decision in *McCarty* [453 U.S. 210, 101 S.Ct. 2728] that did not divide retired pay continues to be a significant problem. Years after final divorce decrees have been issued, some state courts, particularly those in California, have reopened cases (through partition actions or otherwise) to award a share of retired pay. Although Congress has twice stated in report lan-

guage that this result was not intended, the practice continues unabated. Such action is inconsistent with the notion that a final decree of divorce represents a final disposition of the marital estate.

H.R.Rep. No. 101–665, at 279, *reprinted in* 1990 U.S.C.C.A.S. at 3005. The committee report is consistent with a committee report at the time the USFSPA was originally enacted, which stated that it was not Congress's intent to allow the reopening of pre-*McCarty* decrees. *See, e.g.,* H.R.Conf.Rep. No. 97–749, at 168, *reprinted in* 1982 U.S.C.C.A.N. at 1573 ("[T]he conferees intend this provision to preclude recognition of changes to court orders finalized before the *McCarty* decision if those changes are effected after the *McCarty* decision and as a direct result of the enactment of the new title X of this conference report. In other words, the courts should not favorably consider applications based on the enactment of this title to reopen cases finalized before the *McCarty* decision wherein military retired pay was not divided.").

■ 19. It is true that some courts have expressed reluctance to rely on legislative history in the form of committee reports on the ground that it is the statute, and not the committee report, that is enacted or on the ground of doubt about whether the members of Congress even read the committee reports. *See City of Chicago v. Environmental Defense Fund,* 511 U.S. 328, 337, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994); *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 620, 111 S.Ct. 2476, 2489, 115 L.Ed.2d 532 (1991) (Scalia, J., concurring). Nonetheless, a traditional tool for interpreting statutes is to look at the historical circumstances which led to the enactment of the statute. *See Methola v. County of Eddy,* 95 N.M. 329, 333, 622 P.2d 234, 238 (1980). For example, courts will sometimes infer a particular legislative intent based on the timing of statutory enactments. *See Coslett v. Third Street Grocery,* 117 N.M. 727, 730–31, 876 P.2d 656, 659–60 (Ct.App.1994). The committee report on which we rely in this case is probably a more reliable indication of what motivated the enactment of the statute at issue than the traditional use of what is essentially informed guesswork.

■ 20. Thus, we find particularly persuasive the statement in the House committee report that Paragraph 1408(c)(1) was motivated by decisions of the California courts. Given that context, any ambiguity in the words "reserve jurisdiction to treat" disappears. The quoted language can refer only to a reservation of jurisdiction explicitly stated in the decree, not a reservation of jurisdiction implicitly incorporated into the decree by virtue of state law. If we were to rule that Section 40–4–20(A) reserved jurisdiction to treat Husband's retirement benefits, we would circumvent Congressional intent. Community property states which rely upon statute or case law to reserve jurisdiction over the division of community assets would still be able to divide military retirement benefits, which is exactly what Congress wanted to avoid.

21. We are supported in this result by the only California court to rule on this issue after Paragraph 1408(c)(1) was enacted. *In re Marriage of Curtis,* 7 Cal.App.4th 1, 9 Cal.Rptr.2d 145, 153 (1992); *see also Johnson,* 824 P.2d at 1383–84; *Johnson v. Johnson,* 605 So.2d 1157, 1161 (La.Ct.App.1992); *cf. Buys v. Buys,* 924 S.W.2d 369, 375 (Tex. 1996) (noting split of authority among Texas courts of appeal on this issue, but not resolving the split). California law is not materially different from New Mexico's insofar as distribution of community property omitted from divorce decrees is concerned. In both states, such property may be later divided. The only material difference appears to be that California has established its rule by case law whereas New Mexico has established its rule by statute. *Compare Henn v. Henn,* 26 Cal.3d 323, 161 Cal.Rptr. 502, 505, 605 P.2d 10, 13 (1980) *with* Section 40–4–20(A). If it is true, as the dissent claims, that the purpose of the 1990 amendment to USFSPA was to prohibit courts from transferring from one spouse to another what had become the separate property of the first spouse, Congress certainly chose very peculiar language to express that purpose. No language in the 1990 amendment can reasonably be read as distinguishing between California law and New Mexico law. In addition,

the legislative history to Paragraph 1408(c)(1) unmistakably shows that its purpose was to overturn the California practice of reopening divorce decrees that were silent on the issue of retirement pay. Therefore, we hold that it equally preempts New Mexico practice.

22. Accordingly, it does not matter whether we think the enactment of Paragraph 1408(c)(1) is ill advised or not. To be sure, policy arguments can be made both ways. *Compare* H.R.Rep. No. 101–665 at 279, *reprinted in* 1990 U.S.C.C.A.N. at 3005 *with In re Marriage of Curtis*, 9 Cal.Rptr.2d at 153. *See generally* William A. Reppy, Jr., *The 1990 U.S.F.S.P.A. Amendment: No Bar to Recognition of Tenancy in Common Interests Created by Pre–McCarty Divorces That Fail to Divide Military Retirement Benefits*, 29 Idaho L.Rev. 941 (1992–93). However, the notions that Paragraph 1408(c)(1) might be bad policy or that Congress might have misunderstood what it was doing in enacting Paragraph 1408(c)(1), *see* Reppy, *supra*, at 952–54, do not grant this Court liberty to ignore paramount federal law. *See McCarty*, 453 U.S. at 235–36, 101 S.Ct. at 2742 (decision as to what protection should be accorded former spouse of retired military member is for Congress alone).

23. Finally, although we recognize that memorandum opinions are not precedent, *see State v. Gonzales*, 110 N.M. 218, 227, 794 P.2d 361, 370 (Ct.App.1990), *aff'd,* 111 N.M. 363, 805 P.2d 630 (1991), we would be remiss if we did not acknowledge that we did rule on an identical issue to the one decided today four years ago, and we held in a memorandum opinion on the summary calendar that "as a matter of law the [prior] divorce decree reserved jurisdiction to later divide the military retirement benefits that were not divided in the decree," so that Paragraph 1408(c)(1) did not affect the division of military retirement benefits in that case. The attorney for the prevailing party four years ago is the attorney for Wife here.

24. In that case, however, no one challenged the apparent error proposed in our calendar notice by calling our attention to the legislative history on which we rely today. Our courts have repeatedly held that, in summary calendar cases, the burden is on the party opposing the proposed disposition to clearly point out errors in fact or law. *See State v. Sisneros*, 98 N.M. 201, 202–03, 647 P.2d 403, 404–05 (1982); *State v. Mondragon,* 107 N.M. 421, 423, 759 P.2d 1003, 1005 (Ct. App.1988). This law, together with the realization that it would be a daunting task for the appellate court to independently research each and every one of its cases, provides some explanation for the change in result, even though we would have preferred to have gotten it right the first time.

25. There are, however, several lessons to be learned from this experience. First, it points out why the lower courts and members of the bar should be cautious about relying on unpublished opinions, particularly those decided on the summary calendar. Second, it emphasizes to appellate counsel the importance of pleadings submitted on the summary calendar. Third, there is a lesson in humility for the members of this Court. In our defense, however, we repeat that if this Court were to undertake the work that should be performed by appellate counsel on our summary calendar, the appellate process would be so bogged down and delayed as to create severe injustices to all those whose cases appear before us.

## III. CONCLUSION

26. For the foregoing reasons, we reverse the trial court's February 16, 1996, order awarding a share of Husband's military retirement pay to Wife.

27. **IT IS SO ORDERED.**

HARTZ, C.J., concur.

ARMIJO, Judge, dissenting.

28. I respectfully dissent because I do not agree that the award of military retirement benefits to Wife is preempted by federal law. Wife's interest in Husband's military retirement benefits was not addressed in the divorce decree filed in 1973. Availing herself of her right to bring an action to divide previously undivided community property under NMSA 1978, Section 40–4–20(A) (1993), Wife properly brought her petition within the

applicable statute of limitations established by NMSA 1978, Section 37–1–4 (1880). *See Plaatje v. Plaatje,* 95 N.M. 789, 790, 626 P.2d 1286, 1287 (1981) ("[T]he four year statute of limitations of Section 37–1–4, applies to suits to divide personal property brought under Section 40–4–20.").

29. Since 1969, New Mexico courts have treated a married couple's interest in military retired pay earned during the marriage as community property. *See LeClert v. LeClert,* 80 N.M. 235, 236, 453 P.2d 755, 756 (1969); *Walentowski v. Walentowski,* 100 N.M. 484, 486, 672 P.2d 657, 659 (1983); *Norris v. Saueressig,* 104 N.M. 76, 77, 717 P.2d 52, 53 (1986). Community property that is left undivided by a divorce decree is held by the parties as tenants in common after the divorce. *See Berry v. Meadows,* 103 N.M. 761, 769, 713 P.2d 1017, 1025 (Ct. App.1986); *Harris v. Harris,* 83 N.M. 441, 442, 493 P.2d 407, 408 (1972); *Jones v. Tate,* 68 N.M. 258, 262, 360 P.2d 920, 923 (1961); William A. Reppy, Jr., *The 1990 U.S.F.S.P.A. Amendment: No Bar to Recognition of Tenancy in Common Interests Created by Pre-McCarty Divorces that Fail to Divide Military Retirement Benefits,* 29 Idaho L.Rev. 941, 943–45 (1992–93).

30. A New Mexico statute in existence since 1901 provides a mechanism for dividing, distributing, and otherwise partitioning such previously undivided community property. *See* 1901 N.M. Laws, ch. 62, § 31 (codified as amended at § 40–4–20). This statute expressly reserves jurisdiction to treat such undivided property and necessarily became part of the divorce decree at issue in the present case by operation of law. *See Scanlon v. Scanlon,* 60 N.M. 43, 49, 287 P.2d 238, 242 (1955) (domestic-relations statutes become part of divorce decree by operation of law); *Zarges v. Zarges,* 79 N.M. 494, 495, 445 P.2d 97, 98 (1968) (statute confers jurisdiction on district court to hear subsequent, independent action to divide property left undivided in divorce decree).

31. In *Pacheco v. Quintana,* 105 N.M. 139, 143, 730 P.2d 1, 5 (Ct.App.1985), this Court applied Section 40–4–20(A) in the context of military retirement benefits. The central question in the present appeal is the operative effect of Section 40–4–20(A) after Congress amended Paragraph 1408(c)(1) of the Uniformed Services Former Spouses Protection Act (USFSPA) in 1990. *See* Pub.L. No. 101–510, § 555(a), 104 Stat. 1569 (codified at 10 U.S.C. § 1408(c)(1) (1994)).

32. I do not agree with the majority that the preemptive effect of Paragraph 1408(c)(1) of USFSPA depends on whether or not the language in a particular divorce decree reiterates (literally) the statutory reservation of jurisdiction found in Section 40–4–20(A). Section 40–4–20(A) is incorporated into the divorce decree by operation of law regardless of whether its reservation of jurisdiction is repeated on the face of the decree, and hence the parties would have no reason to include such redundant language in their decree at the time it was entered. To make USFSPA's preemptive effect hinge on the presence or absence of such language in the decree is to rely on exactly the kind of arbitrary, technical distinction that Congress wanted to avoid.

33. The Court, in its opinion today, acknowledges that congressional committee reports are not always reliable indicators of legislative intent, especially in the domestic relations context where state law is preeminent and courts "will not find pre-emption absent evidence that it is 'positively required by direct enactment.'" *Mansell v. Mansell,* 490 U.S. 581, 587, 109 S.Ct. 2023, 2028, 104 L.Ed.2d 675 (1989) (quoting *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979)). Nevertheless, the Court relies on language in a House Committee report expressing disapproval of the practice of reopening divorce decrees entered before the United States Supreme Court's decision in *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), to award a share of military retired pay to a service member's former spouse. *See* H.R.Rep. No. 101–665, at 279 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2931, 3005; *cf. In re Marriage of Curtis,* 7 Cal.App.4th 1, 9 Cal.Rptr.2d 145, 153 (1992) (interpreting USFSPA as preempting this practice in California). The wording of the House Committee report does not affirmatively demonstrate that preemption of New Mexico law is "posi-

tively required by direct enactment" in this context.

34. I do not doubt that Congress generally intended to stop state courts from reopening divorce decrees for the purpose of taking property rights in military retired pay from an individual and transferring those rights to his or her former spouse when such rights already had become the *separate property* of that individual either by operation of state law or as a result of express language in a pre-*McCarty* divorce decree. *See* Reppy, *supra*, at 953–54 n. 33 (discussing legislative history of USFSPA). However, the legislative history on which the opinion relies does not support a prediction as to what result Congress specifically intended with regard to New Mexico marital-property laws under the circumstances of this case. In particular, "[t]here is little to suggest that the writer of the Committee Report intended to deprive the military member's ex-spouse of an affirmative remedy that would merely implement property rights previously vested in her by the divorce decree." *Id.* at 960–61 (footnotes omitted).

35. Both the statutory language and the legislative history of USFSPA speak in broad terms that leave courts with the task of sorting out the subtle but significant differences among the marital property laws of the fifty states to which USFSPA applies. In this case, such differences exist between New Mexico's longstanding tradition of community property law and recent developments in the California courts, upon which the majority so heavily relies. *See, e.g., Stephens v. Stephens*, 93 N.M. 1, 3, 595 P.2d 1196, 1198 (1979) (declining to adopt concept of "quasi-community property" embodied in California statute). Thus, if one infers that the reference to the California courts in the House Committee report means that Congress wanted to preempt certain developments in California law, it does not follow that Congress positively required the preemption of New Mexico marital-property law.

36. Further, the historical circumstances regarding the development of California marital-property law at the time Congress was considering the 1990 amendments to USFSPA also do not support the inference that Congress positively required the preemption of New Mexico law in this context. The timing of the 1990 amendments to USFSPA coincides with statutory changes in California law which allow for equitable (in lieu of equal) distribution of previously undivided property in proceedings where a divorce decree is reopened, a feature not found in the New Mexico statute which has remained essentially unchanged since 1901. *Compare* 1989 Cal.Stat. ch. 1105, § 2 (codified as amended at Cal.Fam.Code § 2556 (West 1994)) *with* 1901 N.M.Laws, ch. 62, § 31 (codified as amended at § 40–4–20(A)); *see also* Reppy, *supra*, at 951 n. 28 (citing California statute as example of major change "from 50–50 divisibility to a right to claim an equitable share greater than 50%"). In light of these differences, I do not agree that Congress positively required New Mexico courts to refrain from reopening a pre-*McCarty* divorce decree under Section 40–4–20(A) in order to divide an interest in military retired pay which the parties held as *tenants in common* after the divorce.

37. Under the plain language of Paragraph 1408(c)(1), a New Mexico court is not prohibited from awarding a share of military retired pay to a former spouse if the couple's interest in the military retired pay was community property during the marriage, the divorce decree effectively treated this interest by changing its status from undivided community property to a tenancy in common, and the divorce decree effectively reserved jurisdiction to further treat the military retired pay in a later action to partition the tenancy in common and award separate shares to each spouse. *Cf. Walton v. Lee*, 888 S.W.2d 604, 605 (Tex.Ct.App.1994) (under Texas law, courts automatically treat or reserve jurisdiction to treat community interest in military retired pay by virtue of laws governing ownership of undivided property, and subsequent partition is not precluded by federal law); *Southern v. Glenn*, 677 S.W.2d 576, 582 (Tex.Ct.App.1984) (quoting a dictionary definition of "treat" as meaning "to deal with a matter or subject"); *Security Escrow Corp. v. Taxation & Revenue Dep't*, 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct.App. 1988) ("Unless the legislature indicates a dif-

ferent intent, we must give statutory words their ordinary meaning.").

38. This conclusion is consistent with USFSPA's purpose of protecting the economic interests of former spouses by " 'removing the federal pre-emption found to exist' " in *McCarty*, 453 U.S. at 236, 101 S.Ct. at 2743. *Walentowski*, 100 N.M. at 486, 672 P.2d at 659 (quoting S .Rep. No. 97–502, at 16 (1982), *reprinted* in 1982 U.S.C.C.A.N. 1596, 1611). In enacting USFSPA, Congress recognized that "the unique status of the military spouse and that spouse's great contribution to our defense require that the status of the military spouse be acknowledged, supported and protected." S.Rep. No. 97–502, at 6, *reprinted in* 1982 U.S.C.C.A.N. at 1601. Congress found that such protection is needed because "frequent change-of-station moves and the special pressures placed on the military spouse as a homemaker make it extremely difficult to pursue a career affording economic security, job skills and pension protection." *Id.*

39. The 1990 amendments to USFSPA did not alter these findings or modify these important considerations. *See* H.R.Rep. No. 101–665, at 279, *reprinted in* 1990 U.S.C.C.A.N. at 3005 (stating that 1990 amendment "is consistent with the balancing of state and federal interests that has been the hallmark of this law since its inception"). Rather, the legislative history of the 1990 amendments demonstrates an intent to clarify the statutory language so that courts would not interpret the removal of the pre-emption found to exist in *McCarty* as the creation of a new federal right to retroactively deprive retired service members of their separate property. *See* Pub.L. No. 101–510, § 555(a), 104 Stat. at 1569 (entitled "Prohibition of Certain Retroactive Court Orders"); *cf. Black's Law Dictionary* 1317 (6th ed.1990) (defining "retroactive laws" as "those which take away or impair vested rights acquired under existing laws"); Reppy, *supra*, at 959 ("The House Committee ... sees the Amendment as addressed at reopenings that disturb a final divorce decree which left the military member as sole owner of the pension."). Although Congress recognized this limitation on reopening pre-*McCarty* divorce

decrees when the statute was originally enacted, *see* H.R.Conf.Rep. No. 749, at 167–68 (1982), *reprinted in* 1982 U.S.C .C.A.N. 1569, 1573, the 1990 amendments were necessary because some courts were not interpreting USFSPA in accordance with the drafters' original intent. *See* H.R.Rep. No. 665, at 279, 1990 U.S.C.C.A.N. at 3005 ("[S]ome state courts have been less than faithful in their adherence to the spirit of the law."); Reppy, *supra*, at 960 n. 46 (citing Missouri court's interpretation of USFSPA in 1988 as example of what the 1990 amendments sought to abrogate).

40. New Mexico courts were never cited as being among those which failed to interpret USFSPA in accordance with congressional intent. Moreover, if the spirit of the law is to protect the parties' property rights following a divorce, then courts should disfavor a construction of Paragraph 1408(c)(1) of USFSPA which terminates the interest in military retired pay that a former spouse may hold as a tenant in common under New Mexico community property law. Such a construction could result in an unconstitutional denial of equal protection or a taking of private property for public use without just compensation. See U.S. Const. amends. V, XIV; Reppy, *supra*, at 964–73. "[W]hen one of two constructions raises substantial problems of unconstitutionality, the other construction is adopted." Reppy, *supra*, at 947.

41. Finally, "public policy considerations favor permitting the states to define a [former] spouse's interest in military retirement benefits" and do not favor a construction of Paragraph 1408(c)(1) that only serves to deprive "older and less-ably advised or represented [former] spouses" of the benefit of state marital-property laws that routinely apply to others. *In re Marriage of Curtis*, 9 Cal.Rptr.2d at 153. The general rule established by USFSPA is that the division of military retired pay under state marital-property laws is *not* preempted. The exception to this general rule·only applies to certain divorce decrees that were finalized before *McCarty* was decided in 1981. *See* § 1408(c)(1). Holding that the present case falls under the general rule rather than the

exception can affect only those divorce decrees that apply New Mexico community property law, do not expressly divide a community interest in military retired pay earned during the marriage, and were entered between the *LeClert* decision in 1969 and the *McCarty* decision in 1981—and then only if the petition to reopen the decree was brought within the applicable time limitation. Thus, a determination that Wife's petition in the present case meets all of these requirements is necessarily limited in scope and would not "do 'major damage' to 'clear and substantial' federal interests." *Hisquierdo*, 439 U.S. at 581, 99 S.Ct. at 808 (quoting *United States v. Yazell*, 382 U.S. 341, 352, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966)).

42. I would find that the award of retirement benefits is not preempted by federal law. Because the majority decides otherwise, I respectfully dissent.